```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2                     WESTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,    )
                                  )
 5                    Plaintiff,)
                                  )
 6         vs.                    )   Case No. 09-00143-01-CR-W-ODS
                                  )
 7   ABRORKHODJA ASKARKHODJAEV,   )   Monday, May 9, 2011
                                  )   Kansas City, Missouri
 8                    Defendant.)

 9

10              TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE ORTRIE D. SMITH
11             UNITED STATES SENIOR DISTRICT JUDGE

12

13   APPEARANCES:
     FOR THE PLAINTIFF:           Mr. William L. Meiners
14                                Mr. William A. Alford
                                  Mr. James Felte
15                                U.S. Attorney's Office
                                  400 E. 9th Street, Fifth Floor
16                                Kansas City, Missouri 64106

17

18   FOR THE DEFENDANT:           Pro Se
     Standby Counsel:             Mr. Willie J. Epps, Jr.
19                                Mr. Evan Montgomery
                                  Shook Hardy & Bacon LLP
20                                2555 Grand Boulevard
                                  Kansas City, Missouri 64108
21
     COURT REPORTER:              Ms. Cynthia M. Johnson, RMR
22                                U.S. Court Reporter
                                  400 East 9th Street, Room 8552
23                                Kansas City, Missouri 64106
                                  (816)512-5657
24

25   Proceedings reported by computer stenography; transcript
     produced by computer.
```

1          THE COURT:  Good morning.  Be seated, please.

2          United States versus Abrorkhodja Askarkhodjaev.

3    09-143-01 is the case number.  Bill Meiners appearing for the

4    United States.  Willie Epps and Evan Montgomery appearing with

5    Mr. Askarkhodjaev.  And we have an interpreter to assist

6    Mr. Askarkhodjaev.

7          Eva, will you administer the oath, please?

8                    (Interpreter sworn.)

9          THE COURT:  We scheduled this time for sentencing.

10   Late last week I received a pro se filing from

11   Mr. Askarkhodjaev seeking to appeal Judge Hays' order denying

12   his motion to remove counsel.  I have reviewed the motion and

13   the attachments to the motion.  I see no reason at all to

14   disturb Judge Hays' findings and conclusions.  And so I deny, I

15   will affirm her decision and deny the motion to replace

16   Mr. Montgomery and Mr. Epps as counsel for Mr. Askarkhodjaev.

17         Mr. Askarkhodjaev, you have two options I suppose at

18   this point.  One is to proceed through the hearing today with

19   Mr. Epps and Mr. Montgomery as your attorneys.  The other is to

20   tell me that you want to proceed without legal assistance.  You

21   have the right to do that.  I think it would be extremely

22   ill-advised for you to do it but if you wish to do that you

23   have the right to do it.

24         I'll tell you that from where I sit Mr. Montgomery

25   and Mr. Epps have done a remarkable job representing your

1    interest throughout this entire case.  I can't imagine anyone

2    performing any better than they did.  I am not going to replace

3    them as your attorneys.  So you need to decide whether you want

4    to proceed with their assistance or without.  And that is your

5    decision to make.

6            I'll tell you that it would certainly not be in your

7    interest to attempt to represent yourself in this.  You are not

8    trained in the law.  You have two excellent attorneys who by

9    reason of their academic achievements in law school and by

10   their experience in the practice of law are more than able to

11   assist in the sentencing hearing.  I think that if you proceed

12   on your own, it would be fool-hardy.  But you have that right.

13           So I will ask you now if you want to proceed with

14   Mr. Epps and Mr. Montgomery as your attorneys in this hearing

15   or whether you want to try to do it on your own without their

16   assistance?

17           THE INTERPRETER:  They have not really helped me so

18   far.  I don't think I need them now.

19           THE COURT:  I'm going to try this one more time,

20   Mr. Askarkhodjaev.  The law is a very complicated field.  It

21   requires years of education and these attorneys have years of

22   training and years of experience.  They know the law.  They

23   know the sentencing guidelines.  And they are the only ones on

24   that -- in that area at that table who are equipped to present

25   legal arguments in your favor this morning.

1            It is a terrible mistake for you to attempt to

2      proceed on your own.  Again, you have the right to do that and

3      if it is your wish to proceed on your own, then we'll do that.

4            THE INTERPRETER:  They have not really helped me so

5      they won't be able to help me now.

6            THE COURT:  You're mistaken.

7            THE INTERPRETER:  Previously they haven't helped me.

8      Up to this date they haven't been able to help me and that's

9      why I asked for new counsel.

10           THE COURT:  Well, you're not going to get new

11     lawyers.  I'm not going to appoint new lawyers to represent

12     you.  You have as fine a legal team as there exists in this

13     community, anyway, and it makes absolutely no sense for me to

14     replace them.

15           You are mistaken when you say they have not helped

16     you.  Had you been convicted on all of these charges in this

17     case, Mr. Askarkhodjaev, you would have been facing 25 years,

18     27 years of imprisonment.  And through the efforts of Mr. Epps

19     and Mr. Montgomery they have limited your exposure to twelve

20     years.  They have cut in half the potential exposure that you

21     had in this case.

22           And I'll tell you this in addition, having listened

23     to the evidence in Mr. Dougherty's trial, I am well satisfied

24     that the government could have obtained verdicts of guilty

25     against you.  And based on what I know about this case and what

1    I know about your involvement in this case, I would have given

2    you a sentence far greater than the one they negotiated for you

3    this morning.  So you are absolutely wrong.  You're absolutely

4    mistaken when you say they haven't been helpful to you.

5              Now, if you want to proceed on your own, we'll do

6    just that.

7              THE INTERPRETER:  I have explained all the reasons in

8    my motion.  They have clearly not helped me and I do not need

9    them.

10             THE COURT:  Mr. Epps and Mr. Montgomery, you are

11   relieved from your responsibilities in representing

12   Mr. Askarkhodjaev.  I'll ask you to remain as standby counsel

13   in the event he has questions and try to answer his questions

14   as standby counsel.

15             MR. EPPS:  Thank you, Your Honor.

16             THE COURT:  There are objections to the presentence

17   report.  The primary objection which affects the sentencing

18   guidelines is that the probation department concluded that

19   Mr. Askarkhodjaev had a total offense level of 35.  The parties

20   in the plea agreement agreed that the total offense level would

21   be 32.  It is my practice and my tendency to accept the

22   agreement reached by the parties.  And I do that for a number

23   of reasons, not the least of which is that the parties are more

24   familiar with the case than the Court or the probation

25   department for that matter.  Secondly, accepting agreements

encourages those kinds of agreements and I think the judges
need to encourage agreements. We simply cannot try all the
cases we have for trial. And so I will do that in this case
and I will sustain the defendant's objection to the total
offense level.

I find that the total offense level is the one agreed
to by the parties in the plea agreement. And that is a level
32.

With a criminal history category of 1 the advisory
sentencing range would be 121 to 151 months of imprisonment.

The parties entered into an 11(c)(1)(C) plea
agreement in which the parties agreed that the appropriate
sentencing range in this case was between 10 to 12 years of
imprisonment. When I accepted that plea agreement I bound
myself to impose a sentence within that range and I will do
that. I will impose a sentence within the range agreed to by
the parties.

Mr. Meiners, you indicated you wanted some time for
testimony, witnesses, exhibits. I'll offer you that
opportunity now.

MR. MEINERS: That's correct, Your Honor. Thank you.

There are two areas we'd like to bring to the Court's
attention during this testimony. During the proffer sessions
with Mr. Askarkhodjaev following his plea of guilty and prior
to the commencement of the trial against Mr. Dougherty, it

became clear that Mr. Askarkhodjaev was denying that he was involved in any marriage fraud in this case. The Court will recall that Danielle Holliger pled guilty to marriage fraud in relation to Mr. Askarkhodjaev. It also became clear during the proffer sessions that Mr. Askarkhodjaev was denying any extortionist activities in regard to Jakhongir Kakhkharov. Specifically extortion involved in $12,000 regarding a debt that Mr. Askarkhodjaev felt he was owed by Mr. Kakhkharov.

The evidence would show that Mr. Askarkhodjaev, along with two others, crossed state lines from Missouri to Kansas in order to collect that extortionist debt and also assaulted Mr. Kakhkharov at that time. Therefore, Your Honor, it would be the intention of the United States to call Danielle Holliger and Jakhongir Kakhkharov to establish that Mr. Askarkhodjaev was untruthful in his proffer sessions. And we'd be asking for the sentence of twelve years or 144 months based on his lack of candor.

THE COURT: All right. Proceed.

MR. MEINERS: Call Danielle Holliger.

Your Honor, for the record we are prepared to go forward on the objections stated if the Court wishes to hear that as well.

THE COURT: It will not be necessary for you to offer evidence on the appropriate guideline range. I've accepted the range that the parties have agreed to. It's my intention to

1    simply disregard all of the factual objections and enter a

2    decision based solely upon the agreement between the parties

3    and the evidence I hear with respect to these witnesses.

4                MR. MEINERS:  Thank you, Your Honor.

5           DANIELLE HOLLIGER, GOVERNMENT'S WITNESS, SWORN

6                        DIRECT EXAMINATION

7    BY MR. MEINERS:

8    Q    Ma'am, could you state your name for the record and the

9    Court, please?

10   A    Danielle Holliger.

11   Q    And do you know the defendant in this case,

12   Mr. Askarkhodjaev?

13   A    Yes.

14   Q    When did you first meet Mr. Askarkhodjaev?

15   A    I met him in March of 2004.

16   Q    Where did that meeting occur?

17   A    It occurred at my place of work.

18   Q    And who introduced you to Mr. Askarkhodjaev?

19   A    Her name was Julie Dupree.

20   Q    Do you know for what purpose you were introduced to the

21   defendant in this case?

22   A    Yes.

23   Q    And can you tell -- can you relate that to the Court,

24   please?

25   A    It was to marry him so he could get a green card.

1  Q    Did you have discussions with Mr. Askarkhodjaev concerning

2  this proposed marriage?

3  A    I'm sorry.  Can you --

4  Q    Did you talk to Mr. Askarkhodjaev about this proposed

5  marriage?

6  A    Yes, I did.

7  Q    Tell the Court the nature of those discussions.

8  A    It was just basically he would pay me an amount of $10,000

9  to marry him in return for his green card.

10 Q    Did he tell you why he wanted to stay in this country?

11 A    Yes.  So he could open up his own business and stay here

12 in the United States.

13 Q    How many times did you meet with Mr. Askarkhodjaev prior

14 to your marriage?

15 A    I believe probably about five times.

16 Q    Where would these meetings occur?

17 A    We would go have dinner.  Sometimes he would come to the

18 club when I was at work and we would talk about it.

19 Q    Would you categorize any of these meetings as dates?

20 A    No.

21 Q    Did you have any physical contact with Mr. Askarkhodjaev

22 prior to your marriage?

23 A    No.

24 Q    What was the agreement, the financial agreement in regard

25 to your marrying Mr. Askarkhodjaev?

1  A    It was $5,000 after we got married then $5,000 after he

2  got his green card.

3  Q    Do you recall when you married Mr. Askarkhodjaev?

4  A    Yes.  It was July 19 of 2004.

5  Q    And was that marriage consummated?

6  A    No.

7  Q    Did you ever reside with Mr. Askarkhodjaev?

8  A    No, I did not.

9  Q    Where did you reside back in July of 2004?

10  A    I don't recall that address.

11  Q    Do you know what city?

12  A    It was Independence.

13  Q    Do you know where the defendant resided at that time?

14  A    I know that he lived in Overland Park.

15  Q    Now, did he keep any stuff at your house?

16  A    No, he did not.

17  Q    Did you keep any stuff at his house?

18  A    No.

19  Q    Did you ever go to his house?

20  A    No.

21  Q    Did there come a time when you had to go to the

22  immigration office?

23  A    Yes.

24  Q    Tell the Court about that?

25  A    We went to the immigration office and Alex didn't put in

1    our file in time so we were maybe going to have to come back

2    and I got upset and started crying because I didn't want to.

3    Q    In fact, did you cry pretty much during the entire

4    immigration interview?

5    A    Yes.

6    Q    When was the first payment made to you for this marriage

7    from Mr. Askarkhodjaev?

8    A    The first payment was $2,000 after we got married.

9    Q    How was that made?

10   A    Cash.

11   Q    Do you know approximately when the next payment was?

12   A    I believe the next payment was, we opened a joint bank

13   account and it was a thousand dollars.

14   Q    And why were you paid a thousand dollars by

15   Mr. Askarkhodjaev at that time?  Did he want you to open a bank

16   account with him?

17   A    Yes.

18   Q    Did you utilize that bank account in any manner?

19   A    No, I did not.

20   Q    Why did he want you to enter into a joint bank account?

21   A    He wanted us to open a joint bank account so I could start

22   using it for various reasons to just make it look like and use

23   the account like it was for us.

24   Q    Now, during the time that you married Mr. Askarkhodjaev,

25   were you seeing someone informally?

1   A    Yes, I was.

2   Q    Who was that?

3   A    His name is Craig Strong.

4   Q    Did you later have a child with Mr. Strong?

5   A    Yes.

6   Q    And is that your daughter Mahlon?

7   A    Yes.

8   Q    And can you tell the Court when she was born?

9   A    She was born June 17 of 2005.

10  Q    Did your relationship with Mr. Strong become more serious

11 at some point?

12  A    Yes, it did.  Soon as I got pregnant.

13  Q    I'm sorry.  When did your relationship with Mr. Strong

14 become serious?

15  A    After we found out I was pregnant.

16  Q    Do you know approximately when was that?

17  A    It was in October of 2004.

18  Q    Was he aware of your marriage to Mr. Askarkhodjaev?

19  A    Yes, he was.

20  Q    And did you tell him?

21  A    I did tell him.

22  Q    What was his attitude?

23  A    He really didn't care because we were seeing each other

24 just informally.

25  Q    Did there come a time when Mr. Strong moved in with you?

1    A    Yes.

2    Q    And when was that?

3    A    November.

4    Q    Of 2004?

5    A    November of 2004.

6    Q    Did Mr. Askarkhodjaev know that Mr. Strong had moved in

7    with you at your residence in Independence?

8    A    Yes.

9    Q    Did he have any discussions with you about where mail was

10   going to be sent?

11   A    Yes, sent to our address.

12   Q    Why did he want his mail sent to your address?

13   A    So it would look like we were living together.

14   Q    Can you tell the Court whether or not Mr. Askarkhodjaev

15   ever came over to get his mail?

16   A    Yes, he did.

17   Q    And did he ever see Mr. Strong?

18   A    Yes.

19   Q    What was his demeanor or attitude toward Mr. Strong?

20   A    He would always say hi, shake each others hands, make

21   small talk.

22   Q    Did you subsequently purchase a house with Mr. Strong?

23   A    Yes.

24   Q    When did that occur?

25   A    It occurred in June of 2006.

1  Q    Did there come a time when you met Mr. Askarkhodjaev's

2  girlfriend?

3  A    Yes.  She showed up to my house in September of 2007.

4  Q    Do you remember her name?

5  A    No.

6  Q    Does Barno ring a bell?

7  A    Yes.

8  Q    What was the nature of the conversation you had with

9  Mr. Askarkhodjaev's girlfriend in September of 2007?

10 A    She came to the house and was asking me to divorce him.

11 And she said that some lawyer that she was talking to knew some

12 information about Alex and she wanted me to divorce him.

13 Q    What did you tell her?

14 A    I told her it was something I would talk over with Alex.

15 Q    Did there come a time when you wanted out of this

16 marriage?

17 A    Yes.

18 Q    To Mr. Askarkhodjaev?

19 A    Yes.

20 Q    When did that occur?

21 A    As soon as I found out I was pregnant.

22 Q    And that was back in November of 2004?

23 A    Yes.  October.

24 Q    After Mahlon was born did you have some conversation with

25 Mr. Askarkhodjaev about the birth certificate?

1    A    Yes.

2    Q    Can you tell the Court what the nature of that

3    conversation was?

4    A    He wanted me to put his name on her birth certificate.

5    Q    As the father?

6    A    As the father.

7    Q    What did you tell him?

8    A    I told him no.  That it was out of the question.

9    Q    Would Mr. Askarkhodjaev have conversations with you about

10   the time line when he was going to obtain his green card?

11   A    He told me that after we got married it would be around

12   six months and he would have it.

13   Q    Did that occur?

14   A    No.

15   Q    What happened?

16   A    It just got drawn out for so long and he always would just

17   ask me to wait longer.

18   Q    Now, did you file joint tax returns with

19   Mr. Askarkhodjaev?

20   A    Yes.

21   Q    And why did you do that?

22   A    We did it so if immigration needed the paperwork it would

23   also show that we were a married couple.

24   Q    After Mahlon was born who was able to get the deduction

25   for your child?

1   A    Her father.

2   Q    Did there come a time when you were interviewed by agents

3   of Immigrations and Customs Enforcement regarding this case?

4   A    Yes.

5   Q    Do you recall when that was?

6   A    It was March of 2007.

7   Q    Can you tell the Court what happened?

8   A    They showed up to my door and came in.  And as soon as we

9   sat down and started to talk about all the case for Alex I just

10  started to tell the truth about everything.

11  Q    And did you ever deny what you had done with those ICE

12  agents?

13  A    No.

14  Q    Did you ever deny what you had done ever since that

15  initial interview up to and including today?

16  A    No.

17  Q    Were you asked to make a tape-recorded statement with

18  Mr. Askarkhodjaev approximately one month later on April 17 of

19  2007?

20  A    Yes.

21  Q    I'm going to show you what has been marked for

22  identification as Government's Sentencing Exhibit No. 1.

23          MR. MEINERS:  Your Honor, we left a copy on your

24  table and we've given a copy to the defense as well on Friday.

25  BY MR. MEINERS:

1    Q     Do you recognize Government's Sentencing Exhibit No. 1?

2    A     Yes.

3    Q     Does that appear to be a transcript of a tape of a

4    conversation you had with Mr. Askarkhodjaev on April 17 of

5    2007?

6    A     Yes.

7    Q     And have you reviewed the entire transcript of that

8    conversation?

9    A     I have.

10   Q     In fact, have you done that on several occasions in

11   preparation for trial in this case?

12   A     Yes.

13   Q     And is this transcript a true and accurate depiction of

14   the conversation you had with the defendant back in April of

15   2007?

16   A     Yes.

17         MR. MEINERS:  Offer Government's Sentencing Exhibit

18   No. 1, Your Honor.

19         THE COURT:  Any objection?

20         THE INTERPRETER:  I'd like to object.

21         THE COURT:  On what grounds?

22         THE INTERPRETER:  It's incorrect.

23         THE COURT:  That objection is overruled.

24         Government's Exhibit 1 is admitted.

25

1    BY MR. MEINERS:

2    Q     Can you tell the Court how this taped conversation came

3    about?

4    A     I'm sorry?

5    Q     How did this taped conversation come about?  Did the

6    agents ask you to help them out?

7    A     Yes, they did.  They came over to the house and we had the

8    conversation recorded.

9    Q     I want to turn to page 2 of this transcript and I think

10   I've highlighted what I'm going to be asking you about.  About

11   a third of the way down did you ask him if he was getting a

12   little worried?

13   A     Yes.

14   Q     And what do you mean by that?  Worried about what?

15   A     Being worried as far as it had been several years since we

16   had been to our interview and still hadn't received a green

17   card.

18   Q     Later on, the next highlighted portion, you tell him that

19   you're ready to break up.  I'm starting to be ready to break up

20   with Craig and get my own house.  I want to start over with

21   Mahlon, just you and Mahlon.  Did he know about your daughter?

22   A     Yes, he did.

23   Q     If you could turn to page 5 and the first sentence, this

24   is another call that was made on that date?

25   A     Yes.

1    Q    Do you see the first highlighted passage where it says, I

2    don't think I should have to pay you back.  I think I've held

3    up my end of the deal.  I just don't think that's fair.  What

4    are you referring to?

5    A    Because earlier on in that phone conversation we had

6    discussed getting a divorce and he said, well, if I wanted to

7    divorce him then I would have to pay him back the money that he

8    had already given me.

9    Q    How much money did he give you all told?

10   A    All told cash it was 5,000.  And then the thousand for the

11   computer.

12   Q    Did he also make payments for your car insurance?

13   A    Yes, he did.

14   Q    And the rest of the money, how was that going or when were

15   you to receive the rest of the $10,000?

16   A    I assumed it would have been after he received his green

17   card.

18   Q    And then you stated, I agreed to marry you.  And the next

19   highlighted passage, I married you.  I did my part.  I

20   shouldn't have to pay you back.  What are you referring to?

21   A    Just referring to the amount of time it was taking for him

22   to get his card and I didn't think I should have to pay him

23   back and he should have given me a divorce.

24   Q    In fact, you did everything that your agreement stipulated

25   with Mr. Askarkhodjaev, correct?

1  A     Yes.

2  Q     You married him, correct?

3  A     Yes.

4  Q     Did you show up at immigration for the interviews?

5  A     Yes.

6  Q     And then later on he says, I, I paid you to get my

7  paperwork.  I paid for you to get this.  But I haven't gotten

8  it yet.  Do you see that passage?

9  A     Yes, I do.

10 Q     What is Mr. Askarkhodjaev referring to?

11 A     He's referring to our marriage and --

12 Q     The purpose for your marriage?

13 A     Yes.

14 Q     And then you state, I know you paid me for your paperwork

15 but, you know, Alex, the deal was for me to marry you and not

16 have to wait 5 years to get a divorce from you.  What are you

17 referring to?

18 A     I'm just referring to how long the process was taking.

19 Q     That was page 5.

20         Turn to page 7 and the first highlighted passage.  Do

21 you see that where he says I, I paid you 6,000 for about the

22 deal, out of deal and?

23 A     Yes.

24 Q     What is he referring to?

25 A     He's referring to the installments that he had given me up

1  until this phone conversation.

2  Q    And that was, when was that agreed upon that he was going

3  to make these payments?

4  A    The payments were just kind of as we went along.

5  Q    Next I want to show you what's been marked for

6  identification as Government's Sentencing Exhibit No. 2.  Could

7  you identify that for the record and the Court, please?

8  A    It's a phone conversation between Alex and I.

9  Q    And did that conversation occur on March 26 of 2008?

10  A    Yes, it did.

11  Q    And, again, was that at the direction of the ICE agents

12  that were handling this case?

13  A    Yes.

14  Q    Have you had occasion to review the transcript of that

15  taped call that you had with Mr. Askarkhodjaev back in 2008?

16  A    Yes, I have.

17  Q    And, in fact, again, is this something that you reviewed

18  on several occasions in preparation for trial in this matter?

19  A    Yes.

20  Q    Is this transcript a true and accurate representation of

21  the conversation you had with Mr. Askarkhodjaev on that date?

22  A    Yes.

23        MR. MEINERS:  Offer Sentencing Exhibit No. 2, Your

24  Honor.

25        THE COURT:  Any objection?

1         THE INTERPRETER:  No.

2         THE COURT:  Two is admitted.

3  BY MR. MEINERS:

4  Q    Could you turn to page 2 of that exhibit?  We talked about

5  the tax situation.  It says that you want to go ahead and file

6  your taxes separate this year so you can claim Mahlon?

7  A    Yes.

8  Q    What are you referring to there?

9  A    I didn't want to file our taxes because I wanted to claim

10 my daughter that year in 2008.  I wanted to claim her for my

11 taxes.

12 Q    And is it my understanding that you and Mr. Strong are no

13 longer together in March of 08 and that you wanted to take the

14 deduction for Mahlon?

15 A    Yes.

16 Q    Turning then to the next page, page 3, I want to go to the

17 bottom of that page.  Do you see where you're asking him, is

18 there any reason why he does not want to file separately from

19 you?

20 A    Yes.

21 Q    And does Mr. Askarkhodjaev say because soon we'll get an

22 answer from immigration?

23 A    Yes.

24 Q    And is that the reason why he wanted you to file taxes

25 together with him?

1    A    Yes.

2    Q    The last exhibit I want to show you is Government's

3    Sentencing Exhibit No. 3.  Does that appear to be a transcript

4    of a conversation that you had with Mr. Askarkhodjaev some time

5    later, about three or four months later on June 26 of 2008?

6    A    Yes.

7    Q    And, again, have you had occasion to review this

8    transcript?

9    A    Yes, I have.

10   Q    And, again, on several occasions?

11   A    Yes.

12   Q    And is this transcript a true and accurate depiction of

13   the conversation you had with Mr. Askarkhodjaev on June 26 of

14   2008?

15   A    Yes, it is.

16            MR. MEINERS:  Offer Sentencing Exhibit No. 3, Your

17   Honor.

18            THE COURT:  Any objection?

19            THE INTERPRETER:  No.

20            THE COURT:  Three is admitted without objection.

21   BY MR. MEINERS:

22   Q    Could you turn to page 2.  I'm directing your attention to

23   the highlighted area.  You indicated that you're scared of

24   Alex.  What are you referring to?

25   A    I was referring to him as if we were going to get caught

1  for what we were doing.

2  Q   It says, soothingly he says, don't be.  So it's not going

3  to be anything if we file now.  What is he referring to?

4  A   File for a divorce.

5  Q   On the next page, which would be page 3 of that document,

6  he says they know already we're not living together.  They

7  asked me why we're not living together.  They've been listening

8  to my phone.  We've never talked to each other.  And I said,

9  yes, we not live together because our marriage didn't work out.

10  We are going to divorce.  There is nothing wrong.  Why is he

11  telling you this?

12  A   He's telling me this because he was trying to assure me

13  that we were going to file for a divorce and everything would

14  be okay.

15  Q   Then he says if they come --

16          DEFENDANT ASKARKHODJAEV:  Objection.

17          THE INTERPRETER:  They just said we are not living

18  together.  It doesn't say that here.

19          It was said here that we have never lived together.

20          She said never, we have never lived together.  That's

21  not true.

22          THE COURT:  Mr. Askarkhodjaev, if your objection is

23  that the transcript is inaccurate, then you can point out those

24  inaccuracies on your cross-examination of the witness.

25          If that is your sole objection then that objection is

1    overruled.

2            Proceed.

3            MR. MEINERS:  Thank you, Your Honor.

4    BY MR. MEINERS:

5    Q    Does he indicate later on on that page, if they will come

6    I will put it here November 10, 2007, I'm not living with you

7    any more.  Back November 10.  And you say okay.  What is he

8    referring to?

9    A    He's referring to coming up with a date, he's referring to

10   coming up with a date that we weren't living together any more.

11   Q    That was the date of your separation?

12   A    That's what he said.

13   Q    Had you ever lived together?

14   A    No, we had never lived together.

15   Q    Turning to page 7.  You indicate in the lower highlighted

16   passage, I don't want us to get in trouble either, you know.

17   And Mr. Askarkhodjaev says, yeah, of course.  Yeah.  We don't

18   need to.  And then you reply, and I don't want to go to jail

19   and leave Mahlon.  He says, of course.  What is that

20   conversation referring to?

21   A    It's just referring to he was saying that immigration had

22   came and spoke with him and I was telling him I didn't want us

23   to get in trouble for doing this and getting caught for just

24   having the marriage be fake.

25   Q    On the next page, page 8, you indicate that if immigration

1  comes I'll just tell them what you said.  We separated --  Had

2  you forgotten the date he gave you?

3  A    Yes.

4  Q    And does he supply that for you?

5  A    Yes, he did.

6  Q    He said November.  Then you said November 10?

7  A    Yes.

8  Q    Then he said 2007?

9  A    Yes.

10 Q    And you said okay?

11 A    Yes.

12 Q    Finally, on page 12, the final highlighted portion, does

13 he give you any advice about talking on the phone?

14 A    Yeah.  He had just told me that his phone, he found out

15 was being recorded or somebody was listening so not to say

16 anything over the phone.

17         MR. MEINERS:  No further questions, Your Honor.

18         THE COURT:  Cross-examination?  Mr. Askarkhodjaev?

19                     CROSS-EXAMINATION

20 BY DEFENDANT ASKARKHODJAEV:

21 Q    (Through the Interpreter)  Did you submit this paper, did

22 you file this paper in court to separate or divorce?

23 A    I'm sorry.  I don't know what paper that is.

24         MR. MEINERS:  Your Honor, may I approach?

25         THE COURT:  Pass it to the witness, please.

1          THE WITNESS:  Yes, I did.

2          THE INTERPRETER:  Could we have it back so we can

3    refer to it?

4    BY DEFENDANT ASKARKHODJAEV:

5    Q    (Through the Interpreter) The second page of this document

6    states Petitioner and Respondent were married on July 19, 2004

7    in Kansas City and Petitioner separated on or about November 1,

8    2004 and you stated earlier that we never lived together.

9    A    Yes.

10   Q    Why did you write so in this document?

11   A    Because it's the truth.

12   Q    So that means that we lived together some time?

13   A    We never lived together, no.

14   Q    This document says we separated on November 1, 2004.

15         A lot of things were said today in the courtroom room

16   and I didn't know that it would be a sentencing hearing and I

17   wasn't quite prepared.  I just wanted to add those questions.

18         I have no further questions.

19         THE COURT:  All right.  Mr. Meiners, redirect?

20         MR. MEINERS:  No, Your Honor.  Thank you.

21         THE COURT:  Thank you, Ms. Holliger.  You may step

22   down.

23                              (Witness excused.)

24         MR. MEINERS:  Call Jakhongir Kakhkharov.

25         JAKHONGIR KAKHKHAROV, GOVERNMENT'S WITNESS, SWORN

1                    DIRECT EXAMINATION

2    BY MR. MEINERS:

3    Q    Sir, could you state your name and occupation for the

4    record and the Court, please?

5    A    My name is Jakhongir Kakhkharov.  I working at Bedrock

6    International.

7    Q    I'm going to ask you to kind of talk slowly if you can.

8    It's important that we get everything down that you say.

9           When did you meet the defendant in this case,

10   Mr. Askarkhodjaev?

11   A    June 2005.

12   Q    And how did you come to meet him?

13   A    We have a contract before to come to the United States

14   with Giant Labor Solutions.  They would provide our job in

15   United States by the J1 visa, housekeeping or house person at

16   hotel.  When we arrived in Kansas City, first Bakhrom came to

17   meet us, then after a couple days he show up and introduce

18   himself.

19   Q    And what were the living conditions like when you first

20   started working for Mr. Askarkhodjaev?

21   A    Living in a, I believe, seven students in one two bedroom

22   apartment.

23   Q    Did there come a time when you became more than just a

24   worker for Giant Labor Solutions?

25   A    At that time, no, nothing.  Just --

1  Q    Later on did there come a time when you were a manager of

2  Midwest Management?

3  A    Yes.  2007 in February Mr. Askarkhodjaev, he offer me job

4  by his office doing managing stuff but at that time the other

5  guy was managing his company and I left Kansas City to Florida

6  but after probably 3 months he gave me a call offering a job

7  doing subcontractor with him.

8  Q    What were your duties and responsibilities with, was it

9  Midwest Management that you were with?

10 A    Yes.

11 Q    What were your duties and responsibilities with Midwest

12 Management?

13 A    I'm suppose to be going to the hotel, taking care of the

14 housekeepers, housekeeping, house persons.  If they have a

15 problem with, issues with management, I have to solve it.

16 That's it.

17 Q    Can you tell the Court what happens when the J1 students

18 go home in relation to their last paycheck?

19 A    When they're leaving, what would happen is, for example,

20 if they're leaving today, May 9, they working May 8 also and

21 there is no way to get a time sheet from the management.  And I

22 just give them money by their own time sheets, ones that they

23 have.  If they can tell me I worked 70 hours last two weeks,

24 I'm just going to pay them for 70 hours.  And after two weeks

25 the hotel management, they send me the, they send the time

1  sheet to Mr. Kakhkharov, they work like 50 hours.  There's 20

2  hours.  There's no way to get to fix it.

3  Q    Because they're gone?

4  A    They're gone.  And I already pay them that money.

5  Q    So you take their word for it as to how many hours they

6  work the last two weeks?

7  A    Uh-huh.

8  Q    And if it's wrong where are those students when the

9  tabulation comes in from the hotel?

10 A    Back to their country.

11 Q    And that's typical Uzbekistan?

12 A    Uzbekistan, Russia or Ukraine, whatever they come from.

13 Q    So some times is there a shortage then between the money

14 that was paid to the students and what they actually earned?

15 A    Yes, it comes up short.

16 Q    Did this cause a dispute between you and

17 Mr. Askarkhodjaev?

18 A    Yes.

19 Q    Tell the Court about that?

20 A    First, actually first time it's come up I don't exactly

21 remember the date.  I was short around 3 to 4,000.  And I told

22 him.  He said I have to fix it.  But there's no way.  You can't

23 help with that.  Then it's going up, going up, the short going

24 up, going up to 12,000.  And he told me that I have to pay him

25 back because people's, I told him, which is I already paid this

1   money for students and he's suppose to -- the money.  Next time
2   we'll be short for next housekeepers which are going to be
3   paid.  And he never trust me with that money.  Then he starts
4   threatening me.  And he told me that I have to pay 5,000 first
5   and my family back in my country, they're paying for his family
6   5,000.
7   Q   Now, did you really owe him that money?
8   A   No.
9   Q   Why did your family pay the $5,000?
10  A   Because he's threatening me.  He starts threatening my
11  family, starts threatening myself.
12  Q   Describe where these threats took place?
13  A   First was in an office.  Second time was in a Chipotle by
14  the Plaza.  And third time he come up to my apartment.
15  Q   Let's talk about the threats at the Westport office.  When
16  did those occur?
17  A   In office?
18  Q   Yeah, when though, approximately?
19  A   Approximately November I believe so but I don't remember
20  exactly but it was 2007.
21  Q   All right.  Tell the Court what happened.  What did he
22  tell you?
23  A   I told him which is I paid the students and come up short
24  and he never pay me back.  He said, I don't care.  You have to
25  fix it.  How I'm going to fix it, I didn't have like accounting

1   or something to fix it.  I told him.  He said, I don't care.

2   You have to fix it.  It's your problem.  That's why you're

3   getting paid.  I just left.  I can't prove it.

4   Q    Did he ever tell you what would happen to you or your

5   family if you didn't make the payments?

6   A    Excuse me?

7   Q    Did he ever tell you what would happen to you or your

8   family if you didn't --

9   A    I couldn't tell them.  I just tell them I owe the money

10  for Abror's family and they understanding it.  They have only

11  3,000 at home.  They borrowed 2,000 from my uncle and they're

12  paying 5,000 to his family.  They don't even know what happened

13  yet.

14  Q    Did Mr. Askarkhodjaev ever tell you what might happen to

15  you or your family if you didn't make these payments?

16  A    Yes.

17  Q    What did he say?

18  A    He said he just going to kill my family.

19  Q    Does he have family also back in Uzbekistan to carry out

20  these threats?

21  A    Yeah.  His brother.  He always threatening like he got a

22  good connection back in the country.

23  Q    Has he threatened you or anybody else in your presence

24  prior to that time?

25  A    I remember one time he threaten his wife.

1    Q    He threatened who?

2    A    His wife.

3    Q    Who is that?

4    A    It was in my apartment.  She showed up.  They have kind of

5    a conversation and everything is coming up.  He said I'm just

6    going -- think about your brother.  You have a brother back in

7    the country.  You know I have a connection.  That's what I

8    heard from his first threat to his wife and then he threatened

9    me.

10   Q    What was his wife's name?

11   A    Barno.

12   Q    Do you remember Barno's last name?

13   A    No.

14   Q    Is it spelled B-A-R-N-O?

15   A    Yes.

16   Q    Now when was the next threat?  You talked about at

17   Chipotle down on the Plaza.  When did that take place?

18   A    At the Chipotle?

19   Q    Yes.  When did those threats happen approximately?

20   A    Just approximately just before to get the 5,000 like one

21   day before.  I told him my mom, she was in different city.  And

22   I told him my mom, she's coming from different city and soon as

23   she's going to get in touch, she's going to pay the 5,000.  He

24   said, okay, hurry up.  Hurry up.  He just threaten me like,

25   hurry up if you don't want no problem.

1   Q    Did that occur in December of 2007?

2   A    Just a little before December, yeah.

3   Q    And the threats that you heard him make toward his wife

4   Barno, when were those made?

5   A    Well, one month when he broke up with his girlfriend or

6   wife he living with me about a month.  And, Barno, she come to

7   our apartment and she starts threatening to him which she's

8   going to go and talk to the FBI about his, whatever he's doing.

9   And then he started threatening back, it was her brother.

10  Q    What did he say he was going to do to her brother?

11  A    Exactly same thing.  I'm going to kill your brother.

12  Q    What was her attitude?  What was she like after he said

13  that?

14  A    She was upset then she left.  She didn't do nothing.

15  Q    Now, tell me what happened on December 31 or actually

16  after midnight on January 1 of 2008?

17  A    January 2008, yeah, January, December 31, 3:00 a.m.

18  January 1, 3:00 a.m. he showed up in my apartment with

19  R-U-S-T-A-M, S-H-U-K-U-R-O-V.  They show up 3:00 a.m.

20  Q    Were you expecting them?

21  A    No.  I was sleeping.

22  Q    Tell the Court what happened?

23  A    Came to my apartment.  I let him in and he started talking

24  you got a short 7,000.  You have to pay me right now.  And then

25  he punched me in my face with his open hand twice and then he

1  told me that I got one day to give back his money unless he's

2  going to kill me, unless he's going to do something to my whole

3  family then he -- and I can't do nothing.  I can't even call

4  the police.  I just do whatever he say.  I said, okay, okay,

5  just leave me alone.  And I just give -- he took my driver's

6  license, social security and he give me one day to give him

7  back money and then he left.

8  Q    How long was he in your apartment at 3:00 a.m. on

9  January 1 of 2008?

10  A    About an hour, 45 minutes or hour.

11  Q    What was your demeanor?  What was your attitude?  What

12  were you like after this happened?

13  A    I was upset, of course, and I don't know what to do.

14  Q    What did you do?

15  A    I just called INS.

16  Q    Did you tell them what happened?

17  A    Yeah.

18  Q    When did you first contact INS on this?

19  A    December 23 or December 24, in the 20s.

20  Q    Why did you first contact them then?

21  A    I was, it started first after he start threatening me and

22  I don't know what to do.  And I just go to INS.  I told them

23  whatever I do have and I was actually at that time I didn't

24  have no status with me.  I was illegal at that time.  And they

25  were shocked to come to INS and tell.

1  Q    Was that after you were threatened at Chipotle by

2  Mr. Askarkhodjaev that you initially went to INS?

3  A    Yes, it is.

4  Q    Now, did Mr. Askarkhodjaev come back to your apartment

5  after 3:00 a.m. on January 1 of 2008?

6  A    Next day we have a conversation, phone call.  I told him I

7  don't have no money.  Do whatever you want.  I have no choice.

8  I just called him and told him.  And he starts threatening me

9  again.  And he showed up in my apartment -- R-A-U-S-T-A-F,

10  S-H-U-K-U-R-O-A -- Girl's name D-A-N-A.

11  Q    Do you know how he was able to get into your apartment?

12  A    My apartment was like under the lease but she doesn't even

13  know where the apartment was located.  He brought that girl to

14  go into my apartment but she didn't even know where the

15  apartment was located.  And then went, they went to my

16  apartment, they find out I'm not in there.  And they went to

17  office to get a key.  They got the key and they go in.  Problem

18  is they couldn't find me and then they left.  And later on I

19  heard they come back late night and they got arrested.

20  Q    So they tried again to get into your apartment?

21  A    Uh-huh.

22  Q    So he got into your apartment on 3:00 a.m. on January 1?

23  A    Uh-huh.

24  Q    He then got a key from the office, went back into your

25  apartment the next day?

1    A      Uh-huh.

2    Q      Then he also went back a third time to try to go back into

3    your apartment and that's when he was arrested?

4    A      Uh-huh.

5    Q      You indicated that you made a taped statement with

6    Mr. Askarkhodjaev on January 2 of 2008, is that correct?

7    A      Yes.

8    Q      I'm going to show you what has been marked for

9    identification as Sentencing Exhibit No. 4 and ask if you can

10   identify that?  Does that appear to be a transcript of the

11   conversation you had with Mr. Askarkhodjaev on January 2 of

12   2008?

13   A      Yes.

14   Q      Have you reviewed that taped transcript both in

15   anticipation for trial in this case as well as this sentencing

16   hearing?

17   A      Yes.

18   Q      And is this transcript a true and accurate depiction of

19   the conversation that you had with Mr. Askarkhodjaev on that

20   day?

21   A      Yes.

22              MR. MEINERS:  Offer Sentencing Exhibit No. 4, Your

23   Honor.

24              THE COURT:  Any objection?

25              THE INTERPRETER:  Yes, Your Honor.

1      Who wrote this?  Typed this?

2              THE COURT:  Mr. Meiners?

3              MR. MEINERS:  This was --

4    BY MR. MEINERS:

5    Q    Is it your understanding that this was typed by either ICE

6    or the FBI?

7    A    Yes.

8              THE INTERPRETER:  Did the witness write it himself or

9    was it prepared by somebody?

10             THE COURT:  The testimony is it was transcribed.  It

11   has been shown to him.  He testified that it is a true and

12   accurate transcription of the conversation had that day.

13             THE INTERPRETER:  This is the first time I've seen

14   this.

15             THE COURT:  Do you object to it?  And if so, what is

16   the basis of your objection?

17             THE INTERPRETER:  I don't know.  This is the first

18   time I've seen this.

19             THE COURT:  Mr. Meiners, has this transcript been

20   made available to either Mr. Askarkhodjaev or his counsel prior

21   to today?

22             MR. MEINERS:  Yes.  Literally over a year ago.

23             THE INTERPRETER:  It is the first time I have seen

24   the previous transcript as well.

25             THE COURT:  Is that your objection?

1          THE INTERPRETER:  Yes.

2          THE COURT:  That objection is overruled.

3     Government's Exhibit 4 is admitted.

4          MR. MEINERS:  Just for the record, Your Honor, all of

5     the government's exhibits introduced at this sentencing hearing

6     have been turned over to Mr. Askarkhodjaev over a year ago.

7          THE COURT:  Proceed.

8     BY MR. MEINERS:

9     Q    As I understand it this is a taped conversation concerning

10    a telephone call that you made with Mr. Askarkhodjaev, is that

11    correct?

12    A    Correct.

13    Q    I want to turn to page 2 and I've highlighted some of the

14    passages.  In the middle of the page he says -- we're going to

15    have to use language similar to what is in here so the record

16    is complete.

17          The check is in your hands.  Let me deal with it.  I

18    will F you up, Jahan.  What are you thinking of yourself?

19          What is he referring to?

20    A    Before that we talking about money that he just received

21    in cash.  And then the check in your hands, let me deal with

22    it.  He tried to say that he paid me like all the money which

23    the housekeepers suppose to get that.

24    Q    And does he make a threat?

25    A    Yeah.

1    Q    Does he make a threat in that passage?

2    A    Yes. (Unintelligible.)

3            THE COURT:  I can't understand you.

4    BY MR. MEINERS:

5    Q    Did he indicate he was going to hurt you in that passage?

6    Is that what that is about?

7    A    Yes.

8    Q    Now, later on in the bottom does he say, does he ask where

9    you are?

10   A    Where exactly you are.  He's trying to find me.  Where

11   exactly you are.  Where you calling from?  Trying to find out

12   where I'm located.

13   Q    I want to have you turn to page 4.  Does he indicate that

14   in the second highlighted passage, I will find you in your

15   place.  I will find you even if I have to lie in waiting?

16   A    Excuse me.  What page?

17   Q    Page 4?

18   A    Uh-huh.

19   Q    Do you see the second highlighted passage?

20   A    Yes.

21   Q    Does he tell you there that he's going to wait for you?

22   A    Yeah.  Hey, Jahan, where you at?  You better tell me.  I'm

23   coming to you and I'll have a talk.  He tried to find out where

24   I'm located.  He using words he wants to talk to me face to

25   face.

1    Q    Does he then tell you when he can't find you, go ahead and

2    call the police.  I will tear your mother's C in pieces.  Just

3    go ahead and call the police?

4    A    Yes.

5    Q    Do you remember him telling you that about your mother?

6    A    Yes, of course.

7    Q    And he says FU and F your mother's C, you little son of a

8    faggot?

9    A    Yes.

10   Q    Is this part of the threats that he made to you both in

11   this conversation and elsewhere?

12   A    That day he was that kind of conversation first time with

13   me.

14   Q    Did you ask him on page 5 to return your ID and your

15   driver's license?

16   A    Yes.

17   Q    And does he say F I will hand your mother's C to you.  I

18   will personally hand it to you?

19   A    Yes.

20   Q    On page 6 you ask him what he's going to do to you in the

21   first passage that's highlighted?

22   A    Which one?

23   Q    Page 6, do you ask him how do I know what you'll do to me?

24   A    You will know once you are here.  I will hand it to you,

25   okay.

1 Q    Then at the bottom of that passage you talk to him about

2 hitting you the previous day?

3 A    Yes.

4 Q    Does he say that's right and I'm coming to your place?

5 A    Uh-huh.  Right.

6 Q    On the top of page 7 do you ask him why he hit you?

7 A    Yes.

8 Q    And does he say, hey, stupid, I warned you and you did not

9 tell me what I asked?

10 A    Yes.

11 Q    And the next passage did he indicate to you I told you

12 that I will tear you apart?

13 A    Uh-huh.  Yes.

14 Q    On page 8 does he continue on the bottom of the

15 highlighted area to threaten you in that manner?

16 A    Yes.

17 Q    I will F you in your mouth.  I will F you in Tashkent and

18 I will F you here if I have to.  You are fooling with me now?

19 A    Yes.

20 Q    What was his demeanor?  What does it sound like over the

21 phone when he's saying these words?

22 A    He's very upset and he's kind of, he's ready to do

23 anything to get this money.  Tashkent is my city back to where

24 my family is.

25 Q    Does he also threaten you with people coming to your house

1  tomorrow on the last highlighted passage on page 8?

2  A    Yes.

3  Q    On page 9 does he ask you who paid the $5,000?

4  A    Yes.

5  Q    And did you tell him?

6  A    Yes.

7  Q    That your family did?

8  A    Yes.

9  Q    And at the bottom of that passage does he again threaten

10 to do bodily harm to you?

11 A    Yes.

12 Q    And at the bottom of page 10 you tell him you didn't take

13 a penny?

14 A    Yes.

15 Q    Did he tell you that he will crack your head open?

16 A    Yes.

17 Q    Next I want to show you --

18         Well, I have no further questions at this time, Your

19 Honor.

20         THE COURT:  Cross-examination?

21              CROSS-EXAMINATION

22 BY DEFENDANT ASKARKHODJAEV:

23 Q    (Unintelligible.)

24 A    (Unintelligible.)

25         THE COURT:  We have to have this in English.

1    BY DEFENDANT ASKARKHODJAEV:

2    Q    Did you call the Overland Park police and ask them to come

3    over?

4    A    No, I didn't call them.

5    Q    (Unintelligible.)

6         THE COURT:  Translate, please.

7    BY MR. ASKARKHODJAEV:

8    Q    (Through the Interpreter) Did you came to the detective

9    when they arrest me?

10   A    No.

11   Q    (Unintelligible.)

12        THE COURT:  Translate for us, please.

13   BY MR. ASKARKHODJAEV:

14   Q    (Through the Interpreter) When we were arrested, did you

15   come and see the detective?

16   A    No.

17   Q    I had asked to call the detective and my lawyer as

18   witnesses but that hasn't been done.

19        THE WITNESS:  I'm sorry, Judge.  What he's talking

20   about is when he come to our apartment after what when he left,

21   I went to office.  There was one detective sitting in the

22   management office apartment building.  And he saw when I'm

23   talking with the management about the key.  And probably when

24   agents talk to the detective he was warned about my apartment

25   and when he showed up next time he knows about that.

1        DEFENDANT ASKARKHODJAEV:  Okay.  When the detective

2    arrest me the detective said Mr. Kakhkharov contacted Overland

3    Park police.  Overland Park police hold it and they say they

4    waiting for him to come.  He came and -- in one car and they

5    have talked to the detective.  Detective said he didn't play

6    what he had recorded, the conversation.  I said to detective

7    this is set up and this is not like this.  And detective said I

8    have a right to arrest you.  And he arrest me.  While I was in

9    prison Mr. Jakhongir Kakhkharov went to my bank account.

10   $24,000 was stolen from my account.  I have police from Kansas

11   City, Missouri.  I talked to my lawyer.  I said to bring, I

12   hired a lawyer when I was there.  I asked my lawyer to bring

13   this witnesses and he didn't do it.

14       THE COURT:  Do you have any other questions of this

15   witness?

16       THE INTERPRETER:  No further questions.

17       THE COURT:  Redirect?

18       MR. MEINERS:  No, Your Honor.  Thank you.

19       THE COURT:  All right.  Thank you, sir.  You may step

20   down.

21                                    (Witness excused.)

22       MR. MEINERS:  That concludes the government's

23   presentation in this case, Your Honor.  Thank you.

24       THE COURT:  Mr. Askarkhodjaev, you have the right now

25   to present any testimony, evidence, witnesses that you wish to

1    present on the issue of whether or not you were truthful in

2    your proffer to the United States after your plea.

3            THE INTERPRETER:  I cannot proceed at this time

4    because I'm unprepared.  I asked for some witnesses to be

5    brought and my lawyers didn't do that.  And that's why I asked

6    to continue without counsel.

7            THE COURT:  Mr. Askarkhodjaev, you entered your plea

8    of guilty in this case in October, specifically October 20 of

9    last year.  It has now been a full 6 months since the date of

10   your plea of guilty.  The case has been set for sentencing once

11   and continued at your request.  There is no reason why you

12   should not be ready to proceed this morning.

13           If your attorneys decline to call witnesses that you

14   thought should be called, it is because they had good and sound

15   reasons for not doing that.  I am not going to postpone or

16   continue this hearing.  We'll simply move forward.

17           The plea agreement provides that specifically in

18   Section 10G that if the defendant provides full cooperation and

19   truthful testimony in any and all investigations concerning

20   labor leasing fraud that the government will recommend a ten

21   year sentence.  But if the defendant fails to provide truthful

22   testimony and full cooperation about the labor leasing fraud

23   the government will recommend 12 years.  And in no event will

24   the sentence be lower than 10 or greater than 12.

25           The evidence submitted by the United States this

1  morning was an effort to show that Mr. Askarkhodjaev has not

2  been truthful or cooperative with the United States under the

3  terms of the plea agreement.

4          Mr. Meiners, what else do you have?

5          MR. MEINERS:  Nothing, Your Honor, other than just to

6  indicate to the Court that based on misrepresentations we could

7  not in good faith put Mr. Askarkhodjaev on the stand in the

8  Dougherty case and therefore we'd be asking for a sentence of

9  144 months.

10         THE COURT:  All right.  Mr. Askarkhodjaev, it is now

11 your opportunity to tell me why you think I should impose a

12 sentence of 120 months rather than 144 months.  I'm happy to

13 hear anything you may have to say.

14         THE INTERPRETER:  The plea agreement was given to me

15 on the 14th of March 2011.

16         At the previous hearing they told that I was given, I

17 was provided a copy of that plea agreement.

18         Then during our phone conversation on April 4, I was

19 asked to refer to the plea agreement which I had sent to be

20 translated into Uzbek.

21         And later they wrote to me, I am attaching another

22 copy of your plea agreement to this letter and then it ended

23 you have mailed the copy of the plea agreement I previously

24 provided you to your cousin for translation to Uzbek.

25         Then on February 28 when you came here referring to

1   me, the translator, I asked to translate and asked them to give

2   me a copy of the plea agreement.

3           When you came to translate our meeting about the PSI.

4           And then at that meeting they said they scanned a

5   copy of the plea agreement right away and only sent it to me on

6   March 15.

7           Had I received a copy earlier I would see these

8   issues and be more prepared.

9           And three documents weren't fully translated to me,

10  the indictment, the presentence investigation report and the

11  plea agreement.

12          I was repeatedly told that I would get 27 years and I

13  was scared and because of that I entered into the plea

14  agreement and I even fainted at that hearing when I was

15  accepting the plea.

16          I was -- I was scared and that is the reason I was

17  put in the position to accept those terms, that agreement.

18          The statement addressed to me, please say that you

19  didn't translate those documents fully, completely verbatim,

20  the plea agreement word for word, the entire document.

21          Question to me again. You haven't seen the entire

22  indictment, true? Right?

23          Please say again request to me. I'm just

24  translating.

25          The entire indictment wasn't translated to me but I

1    don't know exactly what I was charged with.

2           I wasn't explained in detail.

3           And now I've got a translation of the PSI and there

4    are some inaccurate or untrue things in it.  Many, many things.

5           THE COURT:  There are a number of objections to the

6    factual findings contained in the presentence report,

7    Mr. Askarkhodjaev.  I have announced that I'm not going to rely

8    upon any of those factual allegations to which you have

9    objected.  I have granted your only objection to the

10   presentence report.

11          The question now is whether the United States has

12   presented sufficient evidence to justify its position asking

13   for a sentence of 12 years rather than 10 years.

14          THE INTERPRETER:  Not all of my objections have been

15   raised.  That is why I don't even know what to say.  I didn't

16   know that would happen this way.

17          THE COURT:  Mr. Epps, is there anything you want to

18   say in response?  I'm going to give you an opportunity to

19   protect yourself if you wish to do so, and Mr. Montgomery?

20          MR. EPPS:  Judge Smith, at this time Mr. Montgomery

21   and I will rely on the record that we set forth before Judge

22   Sarah Hays at the previous hearing as to what we provided

23   Mr. Askarkhodjaev, when we provided it.  But I will quickly say

24   that the gentleman sitting to my left, Mr. Montgomery, in

25   particular has spent an inordinate amount of time holding

1    Mr. Askarkhodjaev's hand throughout our representation and I'm

2    proud of the work that Evan did.  And I know that I personally

3    have invested hundreds and hundreds and hundreds of hours into

4    Mr. Askarkhodjaev's case and personally going over evidence

5    with him.  But let's rely on the record that we created in

6    front of Judge Hays weeks ago.  Thank you, Judge.

7            THE COURT:  For the record I have reviewed the

8    pertinent portions of that transcript as they relate to

9    counsel's representation.

10           Mr. Askarkhodjaev, is there anything else you want to

11   say before I announce my decision this morning?

12           THE INTERPRETER:  On June 23, 2010 I sent a letter to

13   my attorneys raising the objections that I was hoping to raise

14   today regarding the testimony of Jakhongir, the last witness.

15   This was made a long time ago.  There is a copy of this letter.

16           THE COURT:  If Mr. Askarkhodjaev's comments, in

17   response to my invitation, are designed as support for a motion

18   to withdraw his guilty plea, any such motion would be and is

19   hereby denied.  I see no fair and just reason to allow

20   Mr. Askarkhodjaev to withdraw his plea of guilty.

21           Is there anything further you want to say before I

22   announce my decision?

23           THE INTERPRETER:  I thought it was rule of law in the

24   United States.  That's all.

25           I take responsibility for the actions that I took but

1   there were some things that were inaccurate or untrue, there

2   were many things.

3          That's it.

4          He apologizes.  If I said something wrong I

5   apologize.

6          THE COURT:  Mr. Meiners, anything else on behalf of

7   the United States?

8          MR. MEINERS:  No, Your Honor.  Thank you.

9          THE COURT:  The plea agreement between the parties

10  that I approved back in October of last year calls for a

11  sentence of between 10 to 12 years of imprisonment.  The plea

12  agreement specifies the conditions under which the United

13  States would be permitted to ask for a sentence at the top end

14  of that range.  We have heard testimony and viewed exhibits

15  this morning offered by the United States to justify its

16  request for a sentence of 144 months.

17         I'm not sure how useful it is to review all of the

18  sentencing factors in 18 USC 3553 when the agreement between

19  the parties and my acceptance of that agreement locks me in to

20  a sentencing range of 10 to 12 years but I think that some

21  mention of the factors is appropriate and necessary.

22         I'm told that I should impose a sentence sufficient

23  but not greater than necessary to comply with the purposes of

24  the sentencing statute considering the nature and circumstances

25  of the offense and the history and characteristics of the

1   defendant.

2          Without doubt this is the largest, most widespread

3   racketeering conspiracy of this kind in the history of this

4   district and perhaps one of the largest in the United States

5   ever.

6          Mr. Askarkhodjaev was the clear ringleader, organizer

7   and the main reason the conspiracy was as effective and

8   successful as it was without detection.

9          There were hundreds of victims, people who came to

10  the United States in response to the promise we hold out to all

11  the immigrants who come to this country that they will be

12  treated fairly and that they would experience freedom.  To the

13  contrary they were treated very unfairly and in many cases

14  their freedom was restricted by the conspiracy in this case and

15  by Mr. Askarkhodjaev, himself.

16         Turning to the defendant's history and

17  characteristics.  He is a criminal history category 1.  In my

18  view that history, criminal history category drastically

19  underrepresents his criminal conduct over the last 8 to 10

20  years.  I think that the facts of this case would justify an

21  upward departure to a higher criminal history category than the

22  one he received in the presentence report.

23         One of the troubling aspects of this case and many

24  other cases is that I see talent, intelligence and almost

25  genius used for evil purposes.  Had Mr. Askarkhodjaev spent his

1    energy working in a lawful business activity I think he would

2    have excelled.  I think he would have excelled in a legitimate

3    enterprise just as he excelled in this illegitimate enterprise.

4    It is a terrible waste.  It is a terrible misuse of God-given

5    talents and intelligence.

6          I do not believe that the truth is in you,

7    Mr. Askarkhodjaev.  I think everything you see is filtered

8    through a screen of self interest and greed.  And I will tell

9    you that but for the plea agreement entered into in this case I

10   would impose a sentence much larger, much longer than the one

11   the plea agreement allows me to impose.  Given the breadth and

12   vastness of this conspiracy and the effect it had on people's

13   lives, a sentence of 20 years would be modest for the offense

14   you committed.

15         The sentence I impose should be one which reflects

16   the seriousness of the offense, one that promotes respect for

17   the law and one that constitutes a just punishment.

18         In my view a sentence at the highest end of the one

19   agreed upon is necessary and appropriate to address those

20   concerns and probably is insufficient to address those concerns

21   but I'm nevertheless bound by the agreement.

22         The sentence I impose should be one which has a

23   deterrent effect.  One which will deter you from reoffending.

24   One which will deter others from doing what you and others did

25   in this case.  In my view a sentence at the top end of the

1    agreed sentencing range is necessary and again probably

2    insufficient to address that concern.

3           The sentence should be one which protects the public.

4    You will be deported upon completion of your sentence.  The

5    only way you will get back into this country is to enter it

6    illegally.  I hope that you do not do that.

7           Protection of the public is probably less of a

8    concern for the United States than it is for the nation of

9    Uzbekistan.

10          The sentence should be one which considers the kinds

11   of sentences available and affords correctional treatment in

12   the most effective manner.  And it should be one which avoids

13   unwarranted sentence disparities between you and others who

14   have been convicted of the same or similar offense across the

15   country and you and others within this conspiracy.

16          Your attorneys point out that many of the others

17   involved in this conspiracy received modest sentences compared

18   to the one that you have agreed to accept.  I respectfully

19   disagree with your attorneys.  I think that the difference

20   between you and the others is enormous.  You are the one

21   constant in this conspiracy.  You are the reason it succeeded.

22   The others were mere role players in my view.  And I think that

23   difference justifies a much different sentence.

24          So having considered the evidence that I heard this

25   morning, having presided over the Dougherty trial and heard the

1    evidence and hearing the evidence in that case, having

2    considered the guideline range and having considered the

3    factors in 18 USC 3553(a), my judgment is probably a foregone

4    conclusion.

5          Pursuant to the Sentencing Reform Act it is the

6    judgment of this Court that the defendant, Abrorkhodja

7    Askarkhodjaev, is hereby committed to the custody of the Bureau

8    of Prisons to be imprisoned for 144 months on each of Counts 2

9    and 86. And 60 months on each of Counts 63 and 132. All will

10   be served concurrently for a total term of imprisonment of 144

11   months.

12         Upon release the defendant will be on supervised

13   release for 3 years consisting of 3 years on each of Counts 2,

14   83, 60 -- 86 rather, 63 and 132. Those terms to run

15   concurrently.

16         He lacks the ability to pay a fine. The fine is

17   waived. I hereby impose special assessments of $100 on each

18   count of conviction for a total of $400 which is due and

19   payable to the United States immediately.

20         I enter an order of restitution in the sum of

21   $167,246.14 to the individual victims identified in the

22   presentence report, $12,000 to Mr. Kakhkharov and $191,346.14

23   to Brier Payne Meade Insurance Company. Those sums are due

24   now. They're due in a lump sum and they're payable

25   immediately.

1          The restitution to the individual victims will be

2   paid in the amounts listed in the presentence report.  I'm not

3   going to read all of those into the record.

4          Payment to the individual victims will be joint and

5   or made joint and severally with co-defendants Alexandru

6   Frumusache, Viorel Simon and Andrew Cole.

7          The additional restitution will be paid to

8   Mr. Kakhkharov, to Brier Payne Meade Insurance Company and the

9   Internal Revenue Service as reflected in the presentence

10  report.

11         While restitution is owed the defendant will be

12  required to notify the United States Attorney of any change of

13  address within 30 days.  And notify the Court and the United

14  States Attorney if there is a material change in his economic

15  circumstances.

16         Interest on the restitution obligation is waived.

17         While on supervised release the defendant will be

18  required to comply with the standard conditions adopted by this

19  Court and these special conditions.

20         If he is not deported he must report to the probation

21  office within 72 hours following his release.  If he is

22  deported, he will not be required to report to the probation

23  office but he will be prohibited from re-entering the United

24  States illegally or without proper documentation.

25         If by some strange occurrence he is granted

1    permission to re-enter the United States, he must report to the

2    probation office within 72 hours following any such re-entry

3    and continue to report as directed for the remainder of any

4    unexpired term of supervised release.

5            The restitution balance identified earlier is due

6    during the first 30 months of supervision.

7            I'm not going to impose the other routine special

8    conditions in this case because if Mr. Askarkhodjaev re-enters

9    the United States he will very likely be arrested immediately

10   and brought back in for violation of special condition No. 1.

11           Mr. Askarkhodjaev is hereby remanded to custody for

12   service of the sentence imposed.

13           Mr. Askarkhodjaev, you have the right to appeal the

14   decisions reached in this case.  With few exceptions any notice

15   of appeal must be filed within 14 days.  If you are unable to

16   pay the cost of appeal, you can apply for leave to appeal as a

17   poor person.  If you ask, the clerk will file the notice of

18   appeal for you.  If you do not ask, that will not happen.

19           Your plea agreement limits your right to appeal.

20   That limitation is found in Section 16 of the plea agreement.

21   I'll tell you that the Court of Appeals has generally enforced

22   those kinds of waivers.  If you believe that yours should not

23   be enforced then you may present that argument to that court.

24           Mr. Askarkhodjaev, is there anything else from you

25   this morning?

1          THE INTERPRETER:  He's asking about the drug

2     treatment program, the request that was made.

3          THE COURT:  In more than 15 years as a judge I have

4     never denied a request for drug treatment.  I am sorely tempted

5     to do so in this case because, Mr. Askarkhodjaev, I don't think

6     you have any intention of using that drug treatment for the

7     purpose for which it's intended.  I think that your sole

8     purpose for asking for it is to get time off your sentence.

9     However, on the off chance, the remote possibility that it may

10    benefit you, I will recommend you for the program.

11         Anything else?

12         THE INTERPRETER:  Thank you.

13         THE COURT:  Mr. Meiners, anything else from the

14    United States?

15         MR. MEINERS:  Just briefly, Your Honor.  There's been

16    a change in the amount of restitution that the victims are owed

17    in the addendum to the presentence report.  The extra

18    restitution is $172,146.14, which changed the $152,751.14

19    figure.

20         THE COURT:  The addendum that I'm looking at is dated

21    May 6.  Is that the one you're looking at?

22         MR. MEINERS:  This addendum is actually April 1,

23    2011.

24         PROBATION OFFICER:  Your Honor, if I might, the

25    172,146.14 was the amount listed in the presentence report just

1   with some of the changes that have occurred, that information

2   didn't get transferred into the memo to the Court about it.

3           THE COURT:  Say the amount again.

4           PROBATION OFFICER:  The correct amount is $172,146.14

5   to the individual victims that are outlined in the presentence

6   report.

7           THE COURT:  Ms. Whitworth, if I summed the numbers

8   assigned to individual defendants in the May 6th

9   recommendation, does that come to -- it does come to 172.  All

10  right.

11          The total amount of restitution due the individual

12  victims will be $172,146.14.

13          MR. MEINERS:  Thank you, Your Honor.

14          Then, finally, just for the record we would ask the

15  Court enter its order formally dismissing all counts not pled

16  guilty to by the defendant including Count 2, Count 63, Count

17  86 and Count 132.

18          THE COURT:  The government's motion to dismiss all

19  counts to which the defendant did not enter a plea of guilty to

20  is so ordered.  Anything else?

21          MR. MEINERS:  No, Your Honor.  Thank you.

22          THE COURT:  Thank you all.  We are adjourned.

23          DEFENDANT ASKARKHODJAEV:  Excuse me, Judge.

24          THE COURT:  Yes?

25          THE INTERPRETER:  His vehicles were confiscated by

1    the government.  What happens to them?  Because some of them

2    belong to the company.  My lawyers weren't able to give me an

3    answer on that.  And also my documents, birth certificate and

4    such, I also would need my driver's license.

5            MR. MEINERS:  Your Honor, the vehicles would be

6    subject to forfeiture.  We're attempting to get any documents

7    back to Mr. Askarkhodjaev at this time that is not of any

8    evidentiary matter including the birth certificate.

9            THE COURT:  Do you understand that?  The vehicles

10   will be subject to a lawsuit by the United States asking that

11   they be forfeited as part of the gain realized by the

12   conspiracy.  All personal documents of no evidentiary value

13   including your birth certificate will be returned to you.

14           THE INTERPRETER:  There will be a different lawsuit,

15   right?

16           THE COURT:  Yes.

17           Anything further?

18           MR. EPPS:  Yes, Your Honor.  Our termination is still

19   in place, correct?

20           THE COURT:  Your termination is still in place.  It

21   is very likely that if a notice of appeal is filed that the

22   Court of Appeals will ask you to serve as appellate counsel.

23   Then that issue will be theirs to resolve.

24           MR. EPPS:  I just wanted to be sure that

25   Mr. Montgomery and I did not have a responsibility to

1  communicate with Mr. Askarkhodjaev over the next couple weeks

2  to see what he wants to do.  Is that correct?

3          THE COURT:  You have no obligation to initiate any

4  contact with the defendant.  If he calls you as standby

5  counsel, I'll expect you to respond.

6          MR. EPPS:  We will do so.  Thank you, Judge.

7          THE COURT:  We're adjourned.

8                          *    *    *

9                          CERTIFICATE

10  I certify that the foregoing is a correct transcript from the

11  record of proceedings in the above-entitled matter.

12

13   5/27/2011                   /s/ Cynthia M. Johnson

14    Date

15

16

17

18

19

20

21

22

23

24

25